IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-02408-CMA-KMT

SENAD GLUHIC,

      Plaintiff,

vs.

SAFEWAY INC.,

      Defendant.

---

# DEFENDANT SAFEWAY'S
# MOTION FOR SUMMARY JUDGMENT AND BRIEF

---

Defendant Safeway Inc. ("Safeway"), by its attorneys, Holland & Hart LLP, hereby

submits its Motion for Summary Judgment and Brief.

## INTRODUCTION

Plaintiff Senad Gluhic ("Gluhic") filed this action on September 13, 2011 against

Safeway.  *See* Compl. (Doc. No. 1).  Gluhic's Complaint alleges five claims for relief under Title

VII of the Civil Rights Act of 1964 ("Title VII") and the Americans with Disabilities Act

("ADA") and a sixth claim for relief alleging wrongful discharge against public policy.  Safeway

submits that there are no genuine issues of material fact and that it is entitled to judgment as a

matter of law dismissing each of Gluhic's claims.

Gluhic has admitted that he knowingly violated Safeway policies and manufacturing

practices by spitting on a co-worker during a late-evening shift at Safeway's Denver Bread Plant.

He cannot show that his termination was because of his national origin (Bosnian), religion

(Muslim), or disability, or in retaliation for raising a complaint of discrimination.  Nor can he

prove he was subjected to a hostile work environment based upon his national origin, religion, or disability.  And finally, Gluhic's state law claim for wrongful discharge in violation of public policy is redundant of his statutory discrimination claims and therefore barred as a matter of law.  Therefore, pursuant to Fed.R.Civ.P. 56, summary judgment is appropriate in this case.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.    Gluhic Begins His Brief Employment With Safeway.**

1.    Gluhic was hired by Safeway's Denver Bread Plant ("Bread Plant") on April 11, 2007 as a part-time Benchhand.  Declaration of Nathan Smith at ¶ 4.[1]  Gluhic never told anyone at Safeway that he was Muslim and "[n]obody ever asked [him] something like that."  Deposition of Senad Gluhic at 8:7-10.[2]

2.    On December 2, 2007, Gluhic became a full-time Checker/Loader in the Bread Plant's Shipping Department.  Smith Decl. at ¶ 4.  As a Checker/Loader, Gluhic worked for Safeway under its collective bargaining agreement with the Bakery, Confectionary, Tobacco Workers and Grain Miller International Union.  *Id.*

3.    Upon commencing his employment with Safeway, Gluhic received a booklet concerning policies and rules relating to the Bread Plant, including the Plant Rules.  *See* Gluhic Depo. Ex. 1 (Gluhic Acknowledgment of Notice)[3]; Gluhic Depo. Ex. 2 (Plant Rules).

---

[1]    The Declaration of Nathan Smith, who made the decision to terminate Gluhic, is submitted with this Motion as Exhibit A, including exhibits cited in the affidavit.

[2]    Cited excerpts of the deposition of Gluhic are submitted with this Motion as Exhibit B.  Gluhic "has limited English-language skills, both written, and verbal."  *See* Compl. (Doc. No. 1), at ¶ 20.  Therefore, his deposition was taken through a Bosnian interpreter.

[3]    Copies of cited Deposition Exhibits are submitted with this Motion as Exhibit C.

4.      The Plant Rules describe different actions and behaviors that "are detrimental to the general operations of the plant for which an employee may be subject to disciplinary action up to and including termination." *Id.*  Safeway does not tolerate employees "fail[ing] to cooperate in maintaining sanitary conditions on Company property" or "threatening in any way . . . the person or property of any other individual." *Id.*

5.      Upon commencing his employment, Gluhic also received a copy of Safeway's Good Manufacturing Practices and acknowledged that he could be terminated for failing to follow them.  *See* Gluhic Depo. Ex. 3 (Gluhic Acknowledgment of Good Manufacturing Practices); *see also* Gluhic Depo. Ex. 4 (Safeway Good Manufacturing Practices).

6.      Since the Safeway Bread Plant is a sanitary facility, for obvious reasons, the Good Manufacturing Practices expressly state that "*[s]pitting is not allowed in the general plant or processing areas*." *Id.* at § 1(p) (emphasis added).

7.      During his employment, Gluhic also acknowledged receiving Safeway's Harassment Policy, which prohibits harassment and encourages employees to immediately report any such conduct to a manager, supervisor, human resources, or through Safeway's toll-free hotline.  *See* Gluhic Depo. Ex. 5 (Harassment Policy Acknowledgment); *see also* Gluhic Depo. Ex. 6 (Safeway Harassment Policy).

**B.      Gluhic Is Disciplined For A Variety Of Issues.**

8.      During the course of his employment with Safeway, Gluhic was disciplined on multiple occasions.  *See, e.g.* Gluhic Depo. Ex. 7 (April 9, 2009 Written Warning); Gluhic Depo. Ex. 8 (January 4, 2010 Documented Verbal Warning).

9.      These disciplinary actions included discipline for disregard of established rules, failure to follow instructions, lack of cooperation, improper procedures, carelessness, quality of work, unauthorized absences and failure to work scheduled shifts.  *See id.*

## C.      Gluhic Complains Regarding Several Comments Made By His Co-Workers.

10.      In November of 2008, Gluhic was pushed by another employee and fell to the floor.  Gluhic Depo. at 11:7-18.  Consistent with the Plant Rules (*see* Gluhic Depo. Ex. 2), this employee was fired by Safeway a mere "***three hours***" after Gluhic complained to Shipping Supervisor Pat Jones.  Gluhic Depo. at 11:19-23 (emphasis added).

11.      During his employment, Gluhic claimed that three of his co-workers uttered swear words referring to his "Muslim mother" and also made comments stating "all Muslims are terrorist."  *Id*. at 9:1-3; 10:1-11.  Gluhic testified that he complained to Mr. Jones "every time" his co-workers made such comments.  *Id.* at 9:18-19; 10:12-16.

12.      He claims he made the first such complaint sometime in late 2008 after he had worked for Safeway for nearly one and one-half years.   At that time, he claims that he told Mr. Jones that co-worker Min Oo was "swearing on my mother every day and on my religion."  *Id.* at 11:24-12:16.  Gluhic's specific complaint to Mr. Jones—in his words—was "Min Oo tell me all day and every day motherfucker Muslim."  *Id.* at 13:1-9.  As a result, Mr. Oo was given a "last reminder" or a final warning concerning his behavior.  *Id.* at 13:10-15.

13.      Gluhic's second complaint to Mr. Jones was in November of 2008 regarding an incident with Mr. Oo in the parking lot.  *Id.* at 14:23-15:3; 16:19-22.  According to Gluhic:

> I said Min in the streets, and then I was using my hands to gesture
> to the spitting, and then he gave me a couple options, couple of
> words because he was trying to help me to remember the words
> that I wanted to say.  And when he said spitting, then I said yes.

*Id.* at 15:4-11.  Gluhic later clarified that the exact words of his complaint to Mr. Jones were "Min [Oo] in the streets and then used the hand gesture for the spitting."  *Id.* at 16:10-11.

14.     In 2009, Gluhic complained to Mr. Jones that Mr. Oo had again called him a "Motherfucker Muslim."  *Id.* at 17:13-21; 18:19-25.  Mr. Jones informed Gluhic that he would speak to Mr. Oo, and roughly one to two hours later, Mr. Jones visited the work-area to "check-in on [Gluhic's] workplace to see if everything is okay."  *Id.* at 19:1-8.

15.     In November or December 2009, Gluhic complained to Mr. Jones that co-worker Mario Espinoza called him a "motherfucker Muslim" and stated "Muslim is a terrorist and Bosnia people is terrorist."  *Id.* at 20:1-7; 20:20-25.  Mr. Jones told Gluhic "he go spoke with him and that would not ever be repeated."  *Id.* at 21:1-3.

16.     Gluhic's last complaint was made in January of 2010 regarding co-worker Brook Asfaw, who is from Africa.  *Id.* at 21:14-25.  At the time, Gluhic was frequently visiting a doctor and having "a lot of blood drawing [sic]."  *Id.* at 22:7-13.  According to Gluhic:

> And then he [Asfaw] started seeing those marks on my skin that I must be using drugs and telling me that I'm using drugs and what kind of drugs am I using and assaulting me, as well, telling me that I'm too old; that I don't need to be the best on that team because I'm too old.

*Id.* at 22:17-22.  When Gluhic complained to Mr. Jones, he reported that Mr. Asfaw had "told me I am use [sic] drug and he say I am old too."  *Id.* at 23:6-10.

### D.     **Gluhic Is Terminated For Spitting On Another Employee While On the Shipping Floor In Violation Of Company Policy And Good Manufacturing Practices.**

17.     At approximately 10:30 p.m. on March 4, 2010, Mr. Asfaw complained to Production Supervisor Allen Gebers that Gluhic had cursed at him and spat in his face.  *See* Smith Decl. at Ex. 1 (March 5, 2010 Email from Allen Gebers to Nathan Smith).  Mr. Gebers

proceeded to interview Gluhic, who claimed that Mr. Asfaw had "cursed at him first and that he had returned the same treatment." *Id.* Mr. Asfaw, however, denied doing anything. *Id.* When Mr. Gebers spoke with Gluhic, Gluhic did not report being spit on by Mr. Asfaw. *See* Smith Decl. at ¶ 5. Mr. Gebers sent both employees home, and reported the issue via email to Plant Superintendent Nathan Smith. *Id.*; *see also* Smith Decl. at Ex. 1.

18.     During the course of the next week, Mr. Smith investigated Mr. Asfaw's complaint, which included interviews of several Bread Plant employees and the review of written statements provided by several employees. *See* Smith Decl. at ¶ 6.

19.      During his investigation, Mr. Smith interviewed Gluhic with his daughter present, who served as his interpreter during the interview.  Smith Decl. at ¶ 7.  During the interview, "Gluhic admitted to spitting on Mr. Asfaw while on the shipping floor but claimed that Mr. Asfaw had spit at him first." *Id.* Gluhic, to this day, does not deny spitting on Mr. Asfaw (*see* Gluhic Depo. at 33:10-15), and also acknowledges he may have swore at him during the incident. *Id.* at 36:2-7.

20.     Mr. Smith also interviewed the complainant, Mr. Asfaw.  Mr. Asfaw told Mr. Smith that Gluhic had begun their March 4, 2010 shift by making derogatory comments about Africa, and that Gluhic had cursed at him, called him a "bitch," and made comments regarding Mr. Asfaw's father. *See* Smith Decl. at ¶ 8.  When Mr. Asfaw walked towards Gluhic to tell him to stop making such comments, Gluhic spat on him. *Id.* Mr. Asfaw denied ever spitting on Gluhic. *Id.*

21.     Mr. Asfaw also provided a written statement to Safeway recounting the incident on March 4, 2010. *See* Smith Decl. at Ex. 2 (Asfaw Statement).  According to Mr. Asfaw,

Gluhic had told him to "watch [his] nose because he [Gluhic] is gone [sic] break it," and told Mr.

Asfaw that he had come to the United States because he never ate food in Africa. *Id.* Gluhic

also told Mr. Asfaw that he should consider himself "as a lucky person" since he was now able

to "eat everyday" in the United States, and, as he reported to Messrs. Gebers that evening, Gluhic

ultimately spat on his face. *Id.*

22.     As part of his investigation, Mr. Smith interviewed Mr. Oo and co-worker Ruben

Rodriguez, who also worked with Gluhic and Mr. Asfaw. *See* Smith Decl. at ¶ 9.  Mr.

Rodriguez told Mr. Smith that Gluhic had made several negative comments to Mr. Asfaw

regarding Africa over the days preceding the March 4, 2010 incident. *See* Smith Decl. at ¶ 10.

23.     Mr. Oo told Mr. Smith that he was standing in the same area when Mr. Asfaw

approached Gluhic and had witnessed him making derogatory comments to Mr. Asfaw regarding

Africa, including that "in Africa there is no food [and] no water," and that Mr. Asfaw had told

Gluhic to "shut up." *See* Smith Decl. at ¶ 11.  According to Mr. Oo, Gluhic's insults lasted

roughly twenty minutes, during which time he told Mr. Asfaw that Ethiopia was the first country

in the world to not have food and that "you [Mr. Asfaw] talking too much because eat too much

food in America." *See* Smith Decl. at Ex. 3 (Oo Statement).  Mr. Oo also told Mr. Smith that,

while he did not see Gluhic spit on Mr. Asfaw, he later saw the spit on Mr. Asfaw's face. *See*

Smith Decl. at ¶ 11.

24.     Based on his investigation, and in consultation with Plant Manager Mitch Haley

and Human Resources Representative Becky DeHerrerra, Mr. Smith made the decision to

terminate Gluhic's employment with Safeway, as he had admitted to spitting on Mr. Asfaw on

the shipping floor.  Smith Decl. at ¶ 12.  Thus, Gluhic was terminated for disregard for

established rules, actions detrimental to morale, discourtesy and, ultimately, spitting on another employee in clear contravention of both the Plant Rules and Safeway's Good Manufacturing Practices. *See* Gluhic Depo. Ex. 10 (March 12, 2010 Corrective Action Report); *see also* Smith Decl. at ¶ 12.

26. Mr. Asfaw was suspended for three days without pay for approaching Gluhic when asking him to stop his insults as opposed to reporting the issue to his supervisor. *See* Smith Decl. at ¶ 13. However, Mr. Asfaw was not terminated, as the only evidence that supported Gluhic's claim that Mr. Asfaw had spit on him was Gluhic's own belated claim made after the incident, which Mr. Asfaw denied. *Id.* Gluhic, however, had admitted to spitting on Mr. Asfaw, a fact that was confirmed, in part, by Mr. Asfaw's immediate reporting of the same on the evening of March 4, 2010 and Mr. Oo's observation of spit on Mr. Asfaw's face. *Id.* at ¶¶'s 11 and 13.

26. During his employment with Safeway, Gluhic never complained to Mr. Smith regarding being discriminated against or being harassed by others because of his religion, national origin, or claimed disability. Smith Decl. at ¶ 14.

## LEGAL STANDARD

Summary judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A fact is "material" if it might reasonably affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Farthing*, 39 F.3d at 1134. Once the motion has been properly supported, the burden shifts to the nonmovant to show, by tendering

depositions, affidavits, and other competent evidence, that summary judgment is not proper.

*Concrete Works*, 36 F.3d at 1518. All the evidence must be viewed in the light most favorable to

the party opposing the motion.  *Simms v. Oklahoma ex rel Department of Mental Health and*

*Substance Abuse Services*, 165 F.3d 1321, 1326 (10th Cir.), cert. denied, 120 S.Ct. 53 (1999).

However, conclusory statements and testimony based merely on conjecture or subjective belief

are not competent summary judgment evidence.  *Rice v. United States*, 166 F.3d 1088, 1092

(10th Cir.), cert. denied, 120 S.Ct. 334 (1999).

## ARGUMENT

**I.**     **Gluhic's Discrimination Claims Should be Dismissed.**

As the Tenth Circuit has repeatedly held, the Court's role in ruling on a summary

judgment motion "is to prevent unlawful hiring practices, not to act as a super personnel

department that second guesses employers' business judgments."  *Kendrick v. Penske Transp.*

*Services, Inc.*, 220 F.3d 1220, 1233 (10th Cir. 2000) (citing *Simms*, 165 F.3d at 1330) (internal

quotes omitted).  Thus, the question is not whether Safeway's termination of Gluhic was "wise,

fair, or correct," but rather, whether it was discriminatory.  *See Timmerman v. U.S. Bank, N.A.*,

483 F.3d 1106, 1120 (10th Cir. 2007).  As explained below, Gluhic cannot establish that it was.

**A.**     **Gluhic's National Origin and Religious Discrimination Claims Are Without Merit.**

Where, as here, an employee's national origin and religious discrimination claims rely

exclusively on circumstantial, rather than direct evidence, the court applies the burden shifting

scheme of *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  *Timmerman,* 483

F.3d at 1113.  The *McDonnell-Douglas* scheme allocates the burden of production to Gluhic to

establish a *prima facie* case of discrimination.  *Id.*  In order to establish a *prima facie* case of

national origin and religious discrimination, Gluhic must show that (1) he is a member of a protected class; (2) he was qualified for his job, (3) despite his qualifications, he was discharged, and (4) his job was not eliminated after his discharge. *Kendrick*, 220 F.3d at 1229; *Barcikowski v. Sun Microsystems, Inc.*, 420 F.Supp.2d 1163, 1180 (D. Colo. 2006) (religious discrimination claim under Title VII).

If Gluhic can establish a *prima facie* case, the burden of production shifts to Safeway to articulate a legitimate non-discriminatory reason for Gluhic's termination. *Timmerman*, 483 F.3d at 1113 (citing *McDonnell Douglas*, 411 U.S. at 802). If Safeway satisfies this burden, the presumption of discrimination attendant to the *prima facie* showing of discrimination "simply drop[s] out of the picture." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)). Once Safeway articulates a legitimate non-discriminatory reason for the adverse action, Gluhic has the "***full burden***" of proof to show that Safeway discriminated against him based on his national origin and/or religion. *See id.* (citing *Bryant v. Farmers Ins. Exch.*, 432 F.3d 114, 1125 (10th Cir. 2005)) (emphasis added). Gluhic may do so by showing that Safeway's proffered reasons for its decision are a pretext for illegal discrimination. *Id.* (citing *Ingels v. Thiokol Corp.*, 42 F.3d 616, 621 (10th Cir. 1994)).

Gluhic cannot establish a *prima facie* case of national origin or religious discrimination because he cannot show the second element, that he was qualified for his job, or the fourth element, that his job was not replaced upon his departure or circumstances which give rise to an inference of unlawful discrimination. With respect to the former, at the time of his termination, Gluhic was not performing satisfactorily given his repeated violations of Safeway policy, and thus, was not qualified for his job. *See* Gluhic Depo. Exs. 7, 8. While disappointing, Gluhic's

behavior on March 4, 2010 was less than surprising, as he had been disciplined several times before for a number of issues, including discipline for disregarding established rules, failure to follow instructions, lack of cooperation, improper procedures, carelessness, quality of work, unauthorized absences and failure to work scheduled shifts. *Id.*

Additionally, there will be no evidence in the record that Gluhic's position was not eliminated after he was terminated. As the plaintiff in this action, it is Gluhic's burden—and his alone—to establish this fourth element of his *prima facie* case, which he will be unable to do. Although a plaintiff can alternatively prove this fourth element by offering evidence of circumstances giving rise to an inference of discrimination, Gluhic will likewise be unable to do so. The only *allegation* Gluhic will rely on is his claim that other co-workers made comments concerning his religion and national origin. However, even if these employees said the words Gluhic alleges they did, they were not the decision-makers—Mr. Smith was. Smith Decl. at ¶ 12. Thus, Gluhic will be unable to point to any factual circumstances giving rise to an inference of discrimination and cannot establish a *prima facie* case. *Barlow v. C.R. England, Inc.*, 816 F.Supp.2d 1093, 1101-02 (D. Colo. 2011) (J. Arguello) (plaintiff failed to demonstrate *prima facie* case of discriminatory discharge where another employee made racial slur, not decision-maker); *Cf. Larson v. United Airlines*, 2012 WL 1959471, at *3 (10th Cir. 2012) ("[S]ome other circumstances surrounding the adverse action – such as a *decision-maker's* discriminatory remarks . . . give rise to an inference of discrimination.") (emphasis added).

However, assuming *arguendo* that Gluhic can establish a *prima facie* case, Safeway can articulate a legitimate, non-discriminatory reason for his termination – his admitted violation of company policy– and Gluhic cannot prove that this justification for his termination is a pretext

for discrimination.  There is simply no dispute that Gluhic spat on an employee—Mr. Asfaw—

while in the Bread Plant.  Smith Decl. at ¶ 7; Gluhic Depo. at 36:2-7.  Thus, irrespective of what

may or may not have been said by the two employees, the fact remains that Gluhic admittedly

violated Plant Rules and the Good Manufacturing Practices, which clearly state that "***[s]pitting is***

***not allowed in the general plant or processing areas***."  *See* Gluhic Depo. Ex. 4 at § 1(p)

(emphasis added).  Though Gluhic claims that he was not at fault during the March 4, 2010

incident, the "pertinent question is not whether [Safeway] was right" to conclude that Gluhic

violated Safeway policy, but whether its belief was genuine rather than pretextual.  *See Hardy v.*

*S.F.Phosphates Ltd. Co.*, 185 F.3d 1076, 1080 (10th Cir. 1999) (internal citations and quotations

omitted).  Gluhic can hardly argue that Safeway's belief was not genuine since he admitted to

spitting on Mr. Asfaw.

     Importantly, "[a] reason to terminate is not pretextual unless it is shown both that reason

was false and that discrimination was the real reason."  *Barlow*, 816 F.Supp.2d at 1102

(quotations omitted).  Gluhic will be unable to offer any evidence that Safeway's stated reason is

false, and further, Gluhic will be unable to support the most common methods of proving pretext,

as there is no evidence that Safeway acted contrary to a written policy or unwritten policy or

practice (*see Wagonerv. Pfizer, Inc.*, 391 Fed.App'x 701, 707 (10th Cir. 2010)) or that any non-

Muslim or non-Bosnian employees were treated differently after admittedly spitting on another

employee.  As explained above, whereas Gluhic admitted to spitting on Mr. Asfaw (a fact

confirmed through Mr. Oo's observation of spit on Mr. Asfaw's face and Mr. Asfaw's

immediate report of the same that evening), there were no witnesses and no evidence to suggest

that Mr. Asfaw had spit on Gluhic beyond Gluhic's unsubstantiated and belated claim made after

the incident.  Mr. Smith's rationale for not believing that Mr. Asfaw had spit on Gluhic – that Gluhic did not make such a claim when he was originally confronted about the incident immediately after it happened (Smith Decl. at ¶ 13) – is inherently reasonable.  For this reason, Gluhic cannot prove pretext.

Gluhic can rely on nothing more than comments he attributes to his co-workers as evidence of pretext.  However, "even at the summary judgment stage, stray remarks and isolated or ambiguous comments are too abstract  . . . to support a finding of [national origin or religious] discrimination."  *See Wagoner*, 391 Fed.App'x at 708 (quotations omitted) ("[National origin or religion] related comments by non-decisionmakers are not material in showing the [employer's] action was based on [national origin or religious] discrimination.").  Thus, even if these employees made the allegedly discriminatory comments Gluhic alleges, they were no more than "stray remarks" under applicable Tenth Circuit law and insufficient to create a jury issue in a case such as this.  *See Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1457 (10th Cir. 1994).  Indeed, as this Court has previously recognized, "[i]n order to rely on [allegedly discriminatory] statements, *[the plaintiff] must show that they are made by a decision maker* and that there was a nexus between the discriminatory statements and the decision to terminate."  *Barlow*, 816 F.Supp.2d at 1101 (quoting *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998)) (emphasis added).  Gluhic has no such evidence here.  Rather, the evidence shows that the few discriminatory words Gluhic predicates his entire case upon were *not* made by the decision-maker who terminated him, Mr. Smith.  *See* Smith Decl. at ¶ 12; *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 531 (10th Cir.1994).

      **B.**     **Gluhic's Disability Discrimination Claim Should Likewise Be Dismissed.**

To make a prima facie case of disability discrimination under the ADA relating to his termination, Gluhic must demonstrate that, at the time his employment was terminated: (1) he was a disabled person as defined by the ADA; (2) he was qualified, with or without reasonable accommodation, to perform the essential functions of his job; and (3) he was fired because of his disability. *Allen v. SouthCrest Hosp.*, 455 Fed.App'x. 827, 830 n. 2 (10th Cir. 2011) (citing *Zwygart v. Bd. of Cnty. Comm'rs*, 483 F.3d 1086, 1090 (10th Cir. 2007)). Gluhic's prima facie case fails for several reasons.

Gluhic will be unable to offer any evidence that he was terminated because of his speech impediment, thereby failing to satisfy the third element of his prima facie case.[4]  Importantly, the third prong of the aforementioned test is not "empty or perfunctory." *Ainsworth v. Independent School Dist. No. 3 of Tulsa County, Okla.*, 232 Fed.App'x 765, 770 (10th Cir. 2007).  Rather, Gluhic must "present some affirmative evidence that disability was a determining factor in the employment decision." *Id.* at 771.  He will be unable to do so.  Furthermore, even assuming Gluhic can establish a *prima facie* case, he cannot demonstrate that Safeway's legitimate reason for terminating him was a pretext for discrimination because of his disability.  Again, while Gluhic may claim that he was not the aggressor on March 4, 2010 or that he did not make the comments Messrs. Asfaw and Oo alleged, he did not and does not deny spitting on Mr. Asfaw while on the shipping floor that evening.  Smith Decl. at ¶ 7; Gluhic Depo. at 36:2-7.  Thus, Gluhic's argument boils down to nothing more than "different interpretations of the situations and the seriousness of his errors," which is insufficient to prove pretext.  *See Mauk v.*

---

[4]      Although there is no evidence that Gluhic was ever placed under any work restrictions, or that he ever informed Safeway that he had a disability, Safeway will assume for purposes of this Motion that his speech impediment substantially limits a major life activity, and thus, is a disability under the ADA.

*Presvyterian Health Plan, Inc.*, 16 Fed.App'x 947, at *1 (10th Cir. 2011).  Because "the record contains no evidence from which a reasonable factfinder could conclude that [Safeway's] stated reasons for terminating [Gluhic's] employment were pretextual," summary judgment should be entered in Safeway's favor.  *Id.*

## II.     Gluhic Cannot Prove The Few Alleged Remarks Made During His Employment Were "Severe or Pervasive" Enough To Alter the Conditions Of His Employment.

In order to survive summary judgment on a national origin, religious, or disability harassment claim, Gluhic must show that, under the totality of the circumstances, (1) the harassment was pervasive and severe enough to alter the terms, conditions or privileges of his employment and (2) the harassment stemmed from national origin, religious, or disability-based animus.  *See Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994).  Thus, Gluhic must demonstrate a nexus between his status in a protected group (e.g. his national origin, religion, and disability) and the alleged conduct.  *Id.* (general harassment if not racial is not actionable).

In other words, Gluhic must "show that a rational jury could find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive and create an abusive working environment."  *Id.* (quotation omitted); *see also Olivarez v. Centura Health Corp.*, 203 F.Supp.2d 1218, 1223 (D. Colo. 2002).  Gluhic cannot satisfy these standards because the conduct that he relies on in support of his claims does not rise to the requisite level of severity.

As a threshold matter, the record is devoid of any evidence of Gluhic being taunted, harassed, or insulted based on his disability.   Although Gluhic may believe that Mr. Asfaw's comment regarding "using drugs" is somehow evidence of disability discrimination, such a vague, abstract and isolated statement can hardly be described as "severe and pervasive"

-15-

harassment.  With respect to Gluhic's race and national origin harassment claims, the U.S.

Supreme Court has observed that "simple teasing, offhand comments, and isolated incidents

(unless extremely serious) will not amount to discriminatory changes in the terms and conditions

of employment."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  Thus, even

assuming Gluhic's allegations were true, the few isolated statements Gluhic relied upon in his

deposition were not pervasive enough to constitute a hostile work environment.  *See Dunegan v.*

*City of Council Grove, Kansas Water Dept.*, 77 F.Supp.2d 1192, 1198-1199 (D. Kan. 1999)

(citations omitted) (placement of hand on plaintiff's leg and kissing her until she pushed away,

followed three weeks later by lurching at plaintiff from behind some bushes and unsuccessfully

trying to grab her, not severe enough to create hostile environment).

Having testified that he complained to his supervisor, Mr. Jones, "every time" his co-

workers made such comments (Gluhic Depo. at 9:18-19; 10:12-16), he proceeded to describe

exactly three occasions when he complained that a fellow worker made comments that could

conceivably contribute to a hostile work environment based on his ethnicity or his religion – (1)

Mr. Oo calling him a "motherfucker Muslim" in late 2008 (*Id.* at 13:1-9); Mr. Oo making a

similar comment in 2009 (*Id.* at 17:13-21; 18:19-25), and Mario Espinoza calling him a

"motherfucker Muslim" and stating "Muslim is a terrorist and Bosnia people is terrorist" in

November or December 2009 (*Id.* at 20:1-7; 20:20-25).  Although regrettable if these incidents

actually occurred, three such incidents over the course of two years cannot credibly be described

as "sever and pervasive" so as to create a hostile work environment. [5]

---

[5]      The notion that Gluhic was intimidated by Mr. Oo (the individual he seemingly identifies as his
main antagonist) is ridiculous, as Mr. Oo is "significantly shorter [and] smaller" than Gluhic, who is 6
feet tall and weighs 220 pounds (Mr. Oo is possibly 5 feet 2 inches tall).  Gluhic Depo. at 19:9-16.

Finally, there is also no support for Gluhic's claim that Safeway failed to address his complaint of alleged harassment and Safeway is entitled to the *Faragher-Ellerth* affirmative defense, which also forecloses Gluhic's claims. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *see, e.g., Duncan*, 356 F.Supp.2d at 1131. Gluhic was well-aware of the safeguards in place to prevent harassment in the work-place (including for example, Safeway's toll-free hotline), as articulated by Safeway's Harassment Policy. *See* Gluhic Depo. Exs. 5, 6. Indeed, Gluhic himself took advantage of such procedures by complaining to his supervisor, Mr. Jones, who addressed his complaints—including firing an employee ***three hours*** after Gluhic complained. *See, e.g.* Gluhic Depo. at 11:19-23; 13:10-15. Based entirely on Gluhic's own testimony, the record clearly establishes that Mr. Jones, appropriately responded to each occasion when Gluhic complained to him, and, as a result his hostile work environment claims fail as a matter of law. *See* Uncontroverted Facts at ¶¶'s 12, 14 and 15.

## III.   Gluhic's Retaliation Claims Fail As A Matter Of Law.

Gluhic contends that his termination was in retaliation for complaining about national origin and religious discrimination. Compl. (Doc. No. 1), at ¶¶ 68-71. However, as there is no evidence of any casual nexus between his supposed complaints and his termination, Gluhic cannot make out a *prima facie* case of retaliation. Moreover, even if he were able to do so, he cannot demonstrate that Safeway's legitimate business reason for terminating his employment was a pretext for retaliation. Thus, his retaliation claims should be dismissed.

To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) he engaged in protected opposition to discrimination; (2) he suffered an adverse action that a reasonable employee would have found material; and (3) there is a causal nexus between his opposition and

the employer's adverse action.  *Antonio, supra,* 458 F.3d at 1181; *Argo v. Blue Cross and Blue Shield of Kansas*, 452 F.3d 1193, 1202 (10th Cir. 2006).

Even assuming Gluhic can prove he engaged in protected opposition when he complained to Mr. Jones, there is no evidence of any casual nexus between his complaints to Mr. Jones and the decision to terminate his employment, which was made by Mr. Smith.  There is no evidence of temporal proximity, and moreover, Gluhic never complained to the decision-maker in this case.  *See* Smith Decl. ¶ 14; *Cf. Domai v. Discover Financial Services, Inc.*, 244 Fed.App'x 169, 174 (10th Cir. 2007) ("[T]here is no evidence on the record that [plaintiff's] new supervisor was even aware of [plaintiff's] comments to management  . . . [and] even if the new supervisor knew about [plaintiff's] concerns, that fact establishes nothing unless [plaintiff] can link it up to some retaliatory behavior by [the new supervisor] [which he] has not . . .").  Hence, absent some admissible evidence of a causal nexus, his retaliation claim must fail.

In the unlikely event Gluhic can establish a *prima facie* case of retaliation, there is no genuine dispute of fact that he was terminated for legitimate business reasons, as described *supra*.  Thus, unless Gluhic can rebut Safeway's non-discriminatory reason for terminating him, his claim must fail.  *See Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1177 (10th Cir. 2007).  Gluhic, however, will be unable to demonstrate that Safeway's reasons for terminating him are a pretext for retaliation.  As explained *supra*, Gluhic was terminated because of his admitted violation of the Bread Plant Rules and Good Manufacturing Practices, a fact that Gluhic is simply unable to rebut.  Indeed, Gluhic has made no allegations thus far linking his complaints (none of which were made to Mr. Smith) to his termination, and cannot even prove temporal proximity between his complaints in 2008 and 2009 and his termination, which occurred long

after.[6] *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1066 (10th Cir. 2009); s*ee also*

*Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1290 (10th Cir. 2007) ("[T]o show pretext

[a plaintiff] 'must ... present evidence of temporal proximity *plus* circumstantial evidence of

retaliatory motive.'") (emphasis in original) (citations omitted).

Ultimately, "'[m]ere conjecture that the employer's explanation is pretext is insufficient

basis to defeat summary judgment.'" *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1267

(10th Cir. 2007) (citation omitted).  Gluhic's retaliation claims should be dismissed.

**IV.   Gluhic's Public Policy Discharge Claim is Barred by the Availability of Other Statutory Remedies.**

Colorado courts have long recognized that the public policy exception to at-will

employment "is not available when . . . the statute in question provides the employee with a

wrongful discharge remedy."  *Gamble v. Levitz Furniture Co. of the Mid-West Inc.*, 759 P.2d

761, 766 (Colo. Ct. App. 1988).  Moreover, Colorado courts have routinely held that public

policy discharge claims are precluded if the remedial schemes of the statutes undergirding such

claims already provide appropriate remedies. *See, e.g.*, *Ferris v. Bakery, Confectionery, &

Tobacco Unio*n*, Local 26*, 867 P.2d 38, 45 (Colo. Ct. App. 1993) (no public policy discharge

claim based upon the Colorado Anti-Discrimination Act where this Act provides a

comprehensive remedial scheme); *Krauss v. Catholic Health Initiatives Mountain Region*, 66

P.3d 195, 203 (Colo. Ct. App. 2003).

In the instant case, Gluhic's public policy discharge claim is precluded by the

availability of retaliation remedies under the antidiscrimination statutes supporting his five other

---

[6]     Gluhic can hardly argue that his January 2010 complaint to Mr. Jones that Mr. Asfaw had "told me I am use [sic] drug and he say I am old too" was protected opposition to discrimination.  Gluhic Depo. at 23:6-10.

claims for relief: Title VII and the ADA.  There is no dispute that Plaintiff's claim is based on his "protected opposition to discrimination by addressing his allegations of Title VII, ADA, and ADAAA discrimination to at least four different members of Safeway management."  Compl. (Doc. No. 1), at ¶ 81.  Accordingly, Title VII and the ADA are the actual statutes undergirding his purported public policy discharge claim, and the availability of retaliation remedies under these statutes precludes Gluhic from maintaining his public policy discharge claim.  *See Gamble*, 759 P.2d at 766 (no public policy claim available for discriminatory discharge in violation of discrimination laws); *Underwood v. GEO Group, Inc.*, 2011 WL 5593150 at *15 (D. Colo. Nov. 17, 2011)..  Put simply, given the availability of Gluhic's Title VII and ADA remedies, "Colorado authority indicates the wrongful discharge claim is not available."  *See Caspar v. Lucent Technologies, Inc.*, 280 F.Supp.2d 1246, 1249 (D. Colo. 2003).

## CONCLUSION

Based on the foregoing, Safeway respectfully request that this Court enter an order dismissing Gluhic's claims.

Date: August 16, 2012.

/s/Gregory A. Eurich
Gregory A. Eurich
Joseph Neguse
of HOLLAND & HART LLP
555 Seventeenth St, Suite 3200
Post Office Box 8749
Denver, Colorado  80201-8749
(303) 295-8166
**ATTORNEYS FOR
DEFENDANT SAFEWAY**

# CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2012, I have caused to be sent via United States mail, postage prepaid, a copy of the foregoing **DEFENDANT SAFEWAY'S MOTION FOR SUMMARY JUDGMENT AND BRIEF** addressed to the following:

Catherine A. Chan
Chan Law Firm
1900 Grant St.
Suite 740
Denver, CO 80203
cchan@chanimmigration.com

s/ Gregory A. Eurich

5692745_3.DOCX